IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| STEPHEN ARCHER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 13-0587-CV-W-REL-SSA |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

<u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Stephen Archer seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) finding that plaintiff's depression and anxiety are not severe impairments, (2) discrediting the opinion of Dr. Stillings, and (3) assessing plaintiff's residual functional capacity. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I. *BACKGROUND*

On April 2, 2010, plaintiff applied for disability benefits alleging that he had been disabled since November 13, 2007, but later amended his alleged onset date to October 20, 2010. Plaintiff alleges disability due to cervical spondylosis; bulging discs; stress disorder; rotator cuff; torn ligaments; and problems with his back, neck, shoulders and lower spine. Plaintiff's application was denied on August 4, 2010. On June 18, 2012, a hearing was held before an Administrative Law Judge. On June 25, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On April 11, 2013, the Appeals Council denied

plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.     Is the claimant performing substantial gainful activity?

>    Yes = not disabled.
>    No = go to next step.

2.     Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>    No = not disabled.
>    Yes = go to next step.

3.     Does the impairment meet or equal a listed impairment in Appendix 1?

>    Yes = disabled.
>    No = go to next step.

4.     Does the impairment prevent the claimant from doing past relevant work?

>    No = not disabled.
>    Yes = go to next step where burden shifts to Commissioner.

  5. Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Kristine Skahan, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1974 through 2011:

| Year | Earnings | Year | Earnings |
| --- | --- | --- | --- |
| 1974 | $ 1,092.20 | 1993 | $24,021.91 |
| 1975 | 0.00 | 1994 | 31,603.76 |
| 1976 | 1,315.82 | 1995 | 20,105.40 |
| 1977 | 1,671.70 | 1996 | 11,068.77 |
| 1978 | 3,993.95 | 1997 | 0.00 |
| 1979 | 3,570.02 | 1998 | 15,084.39 |
| 1980 | 960.00 | 1999 | 33,661.93 |
| 1981 | 9,747.09 | 2000 | 39,057.47 |
| 1982 | 8,140.01 | 2001 | 42,382.29 |
| 1983 | 6,231.88 | 2002 | 47,853.12 |
| 1984 | 9,937.14 | 2003 | 43,715.94 |
| 1985 | 8,007.58 | 2004 | 44,003.84 |
| 1986 | 20,666.40 | 2005 | 46,346.67 |
| 1987 | 22,772.28 | 2006 | 49,502.04 |

| | | | |
|---|---|---|---|
| 1988 | 16,865.41 | 2007 | 0.00 |
| 1989 | 3,325.20 | 2008 | 0.00 |
| 1990 | 15,021.47 | 2009 | 0.00 |
| 1991 | 18,436.10 | 2010 | 0.00 |
| 1992 | 19,835.04 | 2011 | 0.00 |

(Tr. at 135-136).

### Function Report

In a Function Report dated June 20, 2010, plaintiff reported that his condition does not affect his ability to remember, concentrate, understand, complete tasks, follow instructions or use his hands (Tr. at 172). He can pay attention for a "long time," he can follow written and spoken instructions "very well," he handles stress and changes in routine "very well," and he has "no problem" getting along with authority figures (Tr. at 172-173).

### Missouri Supplemental Questionnaire

In this document, dated June 20, 2010, plaintiff reported that he is able to drive and he was receiving Medicaid benefits (Tr. at 176).

### Function Report - Third Party

On June 23, 2010, Mary Pemberton, a friend, completed this form and reported that plaintiff is able to drive a car, pay his bills, count change, handle bank accounts, watch movies, read the Bible, go to church and his kids' sporting events, and go out alone (Tr. at 181-188). His conditions do not affect his ability to sit, climb stairs, squat, kneel or use his hands. His conditions do not affect his ability to understand, follow instructions, complete tasks, remember, concentrate or get along with others. He can pay attention for a long time, he follows written and spoken instructions very well, he is "a very happy man" and gets along

5

with everyone, he handles stress "in a very calm manner," and he handles changes in routine very well.

### B. *SUMMARY OF TESTIMONY*

During the June 18, 2012, hearing, plaintiff testified; and Kristine Skahan, a vocational expert, testified at the request of the ALJ.

### 1. *Plaintiff's testimony.*

Plaintiff was 52 years of age at the time of the administrative hearing (Tr. at 32). Plaintiff was living in a four-plex with his two sons and one nephew, ages 17, 19 and 21 (Tr. at 33). He was 5'9" tall and weighed 225 pounds (Tr. at 33). He has a high school education (Tr. at 33). Plaintiff also has a 28-year-old daughter and he has a 14-year-old son who lives with the child's mother (Tr. at 35).

Plaintiff has a driver's license with no restrictions, but he drives very little (Tr. at 34). During a typical week, he may drive to the store and back once and to QuikTrip and back twice to buy soda (Tr. at 34, 43). Plaintiff was living off his nephew's SSI income of $722 per month (Tr. at 34). Plaintiff was also receiving food stamps (Tr. at 35).

Plaintiff was using a cane on the day of his administrative hearing; however, no doctor has ever prescribed it (Tr. at 35). Plaintiff uses the cane because of problems balancing (Tr at 46). He had been using it for at least three years (Tr. at 52).

Plaintiff last worked in October 2007 (Tr. at 35-36). Plaintiff fell in a pool while he was at work (Tr. at 36). Plaintiff injured his left shoulder in that fall (Tr. at 36). He has limited lifting ability with both shoulders (Tr. at 37). Plaintiff had carpal tunnel release surgery on both hands and he has had very little trouble with either since then (Tr. at 38). Plaintiff filed a worker's compensation case which is currently in the appeal stage (Tr. at 41).

Plaintiff suffers from pain in his left shoulder, his neck and his lower back (Tr. at 38-39). He also has pain in his right shoulder although he has not suffered any injury to that shoulder (Tr. at 54). On a scale of 1 to 10, his left shoulder pain was a 6 or 7, his neck pain was a 7 or 8, and his lower back pain was a 7 or 8 (Tr. at 39). This was after having taken Percocet earlier that day (Tr. at 39). His doctor prescribed Percocet about a month or so before the hearing; before that he was taking 800 mg of Advil for his pain (Tr. at 39). Plaintiff has taken Percocet in the past, and he also used Hydrocodone and Lortab (Tr. at 51). Plaintiff's pain is constant and affects his ability to sleep (Tr. at 52).

Plaintiff takes Klonopin for anxiety and stress (Tr. at 40). He also takes Seroquel (Tr. at 40). Plaintiff has not seen a mental health professional in more than 5 years (Tr. at 41). At the time of the hearing he was receiving no form of mental health treatment other than the medication prescribed by his primary care doctor (Tr. at 41). He was treated for ADHD more than five years before the hearing (Tr. at 49).

Plaintiff has occasional problems with concentration and memory (Tr. at 49). He has trouble remembering the dates of bills so he writes that down (Tr. at 50). He has no other problems concentrating or remembering (Tr. at 50).

Plaintiff spends most of his day sitting in a recliner or lying on the couch (Tr. at 42). His son prepares his meals (Tr. at 42). Plaintiff does very little housework -- nothing more than putting dishes in the sink (Tr. at 42). He does not make his bed, does not clean the bathroom, does not sweep, does not dust (Tr. at 42). He is able to do laundry (Tr. at 42). Plaintiff goes to visit friends or relatives only twice a year (Tr. at 43). He estimated that he can walk a maximum of 30 feet but acknowledged that he had walked into the hearing room from the parking lot (Tr. at 43). Plaintiff can lift things below shoulder height (Tr. at 44-45). He can reach and grab or grasp something below shoulder height and he can hold onto things like

7

a cup of coffee (Tr. at 50). He can use a pen or pencil and he occasionally uses a computer (Tr. at 50-51). Plaintiff is an artist and uses oil paints (Tr. at 43). He cannot bend over to pick something up from the floor -- he could bend over, but he would be unable to stand back up (Tr. at 45). Plaintiff could not use a step ladder to change a light bulb because he is afraid of heights and it would be too challenging to him (Tr. at 46). Plaintiff cannot go up or down stairs; however, "if there was a fire, I'm sure I would figure out some way to get down the stairs or up the stairs" (Tr. at 47).

Plaintiff smokes a half a pack of cigarettes per day (Tr. at 50).

Plaintiff had one epidural but it was not helpful (Tr. at 51). Plaintiff participated in physical therapy but stopped at his doctor's request because the therapist was doing things improperly (Tr. at 53). He testified that his condition has stayed the same over the past three years (Tr. at 52).

### 2. Vocational expert testimony.

Vocational expert Kristine Skahan testified at the request of the Administrative Law Judge. Plaintiff's past work consists of pool installer, DOT 869.463-010, skilled with an SVP of 8, and very heavy exertion (Tr. at 55).

The first hypothetical involved a person who can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can stand and walk 4 hours per day; can sit for 4 hours per day; needs a sit/stand option at will but only if it would not materially adversely affect the ability to perform the job; can occasionally climb stairs, balance, stoop, kneel, crouch and crawl; can never use ladders or scaffolding; can never reach or lift overhead above shoulder height bilaterally; cannot lift bilaterally from below the knees; and is limited to work at an SVP of 4 or less (Tr. at 56). Such a person could not perform plaintiff's past relevant work but could work as a photocopy machine operator, DOT 207.685-014, light with an SVP

8

of 2 (Tr. at 56). There are 400 jobs in Missouri and 19,880 in the country (Tr. at 56). The person could work as a mail clerk, DOT 209.687-026, light with an SVP of 2 (Tr. at 56). There are 1,890 jobs in Missouri and 51,250 in the country (Tr. at 57). The person could work as an inserting-machine operator, DOT 208.685-018, light with an SVP of 2 (Tr. at 57). There are 1,510 in Missouri and 75,500 in the country (Tr. at 57).

The second hypothetical was the same as the first except the person could not kneel, crouch or crawl (Tr. at 57). These additional limitations would not affect the person's ability to perform the three jobs listed in hypothetical one (Tr. at 57).

The third hypothetical was the same as the second except the person would be unable to work a full 8-hour day or 40-hour week on an ongoing and consistent basis (Tr. at 57). Such a person could not work (Tr. at 57-58).

The fourth hypothetical was the same as the first except the person would miss one day of work per week on an unscheduled basis (Tr. at 58). Such a person could not work (Tr. at 59).

## V. FINDINGS OF THE ALJ

Administrative Law Judge Guy Taylor entered his opinion on June 25, 2012 (Tr. at 12-23). Plaintiff's last insured date was December 31, 2011 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since his amended alleged onset date of October 20, 2010[1] (Tr. at 14).

Step two. Plaintiff suffers from cervical spondylosis, degenerative disc disease of the lumbar spine and left shoulder tendonopathy with radiculopathy, all severe impairments (Tr. at 14). Plaintiff's bilateral carpal tunnel syndrome is not severe -- plaintiff had surgery on

---

[1]During the administrative hearing, plaintiff amended his alleged onset date to July 3, 2009 (Tr. at 47). It is unclear from where the October 20, 2010, date originated.

9

both wrists and was discharged with no restrictions or need for future medical care (Tr. at 14-15). Plaintiff's alleged attention deficit hyperactivity disorder, depression disorder, mood disorder, and pain disorder are not medically determinable impairments (Tr. at 15). Plaintiff has received only routine conservative care from a general practitioner, and a state agency psychologist found no mental limitations (Tr. at 15). Plaintiff had not been prescribed narcotic pain medication prior to one month before the administrative hearing (Tr. at 15).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 15).

Step four. Plaintiff retains the residual functional capacity to perform the full range of light work including lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, but he can only walk 4 hours per day, he requires a sit/stand option, he can push and pull with his extremities, he can occasionally climb stairs, balance and stoop but can never kneel, crouch, crawl or use ladders or scaffolding. He is not able to reach or lift overhead or above shoulder height bilaterally or below the knees bilaterally. Due to pain and the resulting loss of concentration he is limited to simple, semiskilled work at an SVP of 4 or less (Tr. at 15-16). With this residual functional capacity, plaintiff is unable to perform his past relevant work (Tr. at 21).

Step five. Plaintiff is capable of performing other jobs in significant numbers including light photocopy machine operator, mail clerk, and inserting machine operator (Tr. at 21-22). Therefore, plaintiff is not disabled (Tr. at 22).

## VI. *OPINION OF WAYNE STILLINGS, M.D.*

Plaintiff argues that the ALJ erred in discrediting the opinion of Wayne Stillings, M.D. Plaintiff argues that Dr. Stillings saw plaintiff on more than one occasion, his mental status exams were primarily based on objective criteria and observation, and he reviewed the entire record before rendering an opinion.

Although plaintiff argues that Dr. Stillings's opinion is one of a "treating physician" who saw plaintiff on more than one occasion, I note that Dr. Stillings's letter to plaintiff's worker's compensation lawyer (Dr. Stillings's only record in this file) indicates that he saw plaintiff on May 23, 2011 (i.e., on one occasion) and that "no doctor-patient relationship exists between the evaluee and the examiner" (i.e., Dr. Stillings never treated plaintiff but instead saw him for an evaluation in connection with his worker's compensation suit).

A treating physician is a doctor who has provided medical treatment or evaluation and who has provided an ongoing treatment relationship with the claimant. See 20 C.F.R. § 404.1502. Dr. Stillings examined plaintiff on only one occasion, and as such he is not a treating physician for purposes of the regulations. Therefore, his opinion would not be entitled to the deference afforded a treating physician. Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). See also Atterberry v. Sec'y of Health & Human Servs., 871 F.2d 567, 572 (6th Cir. 1989).

The ALJ had this to say about Dr. Stillings's opinion:

> On May 23, 2011, Wayne A. Stillings, MD, conducted an independent medical evaluation of the claimant for physical disability on referral by the claimant's Worker's Compensation Attorney, John R. Stanley, in regards to injuries the claimant sustained while in the employment of "Sun and Swim Pools". Dr. Stillings opined that the claimant is suffering from a mood disorder with major depression with an associated 20% psychiatric permanent partial disability of the body as a whole and a pain disorder with an associated 20% psychiatric permanent partial disability of the body as a whole. However, any statement to the effect a claimant is "disabled" or "unable to work" is not a medical opinion, but rather an administrative finding dispositive of a case, requiring familiarity with the regulations and legal standards set forth therein. Such issues are reserved to the Commissioner. . . . Again, it is emphasized that the claimant underwent the examination that formed the basis of the opinion in question not in an attempt to seek treatment for symptoms, but rather, though attorney referral in connection with an effort to generate evidence for a Worker's Compensation claim. Also, it should be emphasized Dr. Stillings['s] assessments were based upon his one time interview with the claimant and based upon only the claimant's subjective statements to him.

(Tr. at 19-20).

11

As noted by the ALJ, plaintiff saw Dr. Stillings on March 23, 2011, for an evaluation in connection with a worker's compensation case. Dr. Stillings is board certified in psychiatry and neurology. Portions of his letter to attorney John Stanley are as follows:

> Steve Archer . . . was seen for a psychiatric IME [independent medical exam] on 05/23/2011. . . .
>
> It was explained to the evaluee that no doctor-patient relationship exists between the evaluee and the examiner. . . .

Dr. Stillings obtained information from plaintiff, from an MMPI-2, a MCMI-III, and records dating from April 8, 2003, through March 9, 2011.

> Mr. Archer reported that his chronic pain disorder, which involves multiple body parts, is aggravated by routine daily activity, such as prolonged sitting, standing, walking, and driving, and this, in turn, significantly limits his activities of daily living. . . . [Plaintiff] generally lead[s] a sedentary lifestyle. He rated his pain disorder as a 7-8/10.
>
> Mr. Archer's major depression began in response to the first work injury and was aggravated by the 11/2007 work injury. His major depressive disorder is characterized by chronic low moods, loss of interest and pleasure in life, poor concentration, pan-insomnia, a 20-pound or so weight gain, disorganized thinking, increased worrying, increased anxiety, spontaneous crying spells, fatigue, feelings of hopelessness/helplessness, morbid/despondent thoughts, but no suicidal ideation. He rated his major depressive disorder as an 8/10. He equally apportioned the pain disorder and major depressive disorder between the two work injuries in terms of causative factors. He reported that he previously had a minor depressive disorder, from which he was mostly recovered, and provided a rating of 2/10 for this.
>
> With respect to his occupational history, Mr. Archer was employed most of his adult life. Initially, he held a few odd jobs and then he went to work for Sun Swim Pools, leaving to obtain vocational training in CAD.[2] In this capacity, he worked for two companies for about one year but did not like this type of work, especially since it was sedentary work in an office. He left this field and returned to work at Sun Swim Pools. He was employed as a working foreman, installing residential/commercial indoor/outdoor swimming pools, waterfalls, hot tubs, etc. His job was quite physical in nature. He enjoyed his job and working outdoors.
>
> On 08/23/2007, . . . Mr. Archer slipped and fell into an empty swimming pool, landing on his left side. . . .

---

[2]I assume this means computer aided drafting.

12

On 11/23/2007, . . . Mr. Archer was involved in an MVA [motor vehicle accident] where his work van was rear-ended by a car while he was stopped at a red light. This caused him cervical and lumbar spinal injuries. . . . [H]e was referred to pain management, but this requested treatment format was denied by the Workers' Compensation carrier. Currently, he is not under the care of a physician for either work injury because he cannot afford it on his own.³ . . .

With respect to other historical lifetime psychiatric issues, Mr. Archer received psychiatric care from Dr. Zaderenko from 2003 through mid 2004 for a depressive disorder and ADHD. During this time, he also saw a psychologist for psychotherapy. . . . He was treated with Wellbutrin for his minor depressive disorder, which was beneficial. At the time of the two work injuries, his depressive disorder was at a low level and, to the best of his recollection, he was not taking antidepressants. . . . In the summer of 2010, his PCP initiated treatment with Klonopin 0.5 mg qid [four times a day], which was beneficial in reducing his anxiety for a while but is no longer providing any benefit, and he is going to consult his doctor for adjustment in this medication. He notes that, if he had insurance, he would have sought psychiatric treatment for the two work injuries but is unable to afford such.

\* \* \* \* \*

MENTAL STATUS EXAMINATION
Mr. Archer was an alert, cooperative, casually attired, sad-appearing, white male who walked with a cane in his right hand. He displayed mild psychomotor retardation consistent with major depression. He had a latency of response to questions, a paucity of mental content, and little spontaneous speech. He appeared to be in some pain, occasionally shifting his position in his chair and standing twice. There were no excessive pain behaviors or signs of symptom magnification. . . . He displayed psychological distress regarding the two work injuries and their sequelae and associated disability. His affect was pleasant but distant and flat. His mood was clinically depressed. Mr. Archer denied hallucinations, delusions, obsessions, compulsions, phobias, and suicidal and homicidal ideation. He was alert and oriented times four. His memory is somewhat impaired by his psychiatric state. Cognitive functions are mildly slowed down by his major depressive disorder. Concentration was fair to poor; verbal comprehension was adequate. Intellectual function in probably in the normal range based on his verbal production. Self-insight is limited; judgment is adequate. When given the opportunity, he had nothing to add to the evaluation. . . .

MMPI-2 RESULTS
This is a valid profile. Depression, anxiety, and somatic problems are his primary problems in a somewhat mixed symptom pattern. He is probably experiencing significant chronic pain. He reported memory dysfunction, concentration problems, and indecisiveness. . . . He views his physical health as failing. He reports that life is no longer worthwhile and fears losing control of his thoughts. Based on item content,

---

³I note that on June 20, 2010, plaintiff indicated he was insured by Medicaid. This was 11 months before this appointment with Dr. Stillings.

13

Case 4:13-cv-00587-REL   Document 28   Filed 12/30/14   Page 13 of 20

there is a significant possibility he has seriously considered suicide. . . .  He is likely to have a mood and/or an anxiety disorder.

\* \* \* \* \*

PSYCHIATRIC DIAGNOSIS:

Axis I:
1. Attention Deficit Hyperactivity Disorder, pre-existing
2. Depressive Disorder, NOS, minor, pre-existing
3. Partner-Relational Problem, pre-existing
4. Parent-Child Relational Problem, pre-existing
5. Mood Disorder with a Major Depressive-Like Episode due to a General Medical Condition (08/23/2007 and 11/23/2007 work injuries)
6. Pain Disorder Associated with Both Psychological Factors and a General Medical Condition (same)

Axis II:
1. Impoverished Educational Background, pre-existing
2. Personality Disorder, NOS, with dependent, avoidant, and self-defeating personality features, pre-existing

Axis III: Per medical records.

Axis IV: Chronic pre-existing emotional problems, two work injuries, disabled from employment, and interaction with the legal system.

Axis V: GAF = 47 (serious symptoms/impairment).

OPINIONS:
Based on chronologic psychiatric/medical history, record review, family history, psychological testing, and mental status examination, the following represent my opinions to a reasonable degree of medical and psychiatric certainty, regarding Mr. Steve Archer:
1. Mr. Archer's psychiatric diagnoses are enumerated above on Axes I and II;
2. Prevailingly causally related to the 08/23/2007 and 11/23/2007 work injuries, Mr. Archer is suffering from a mood disorder with major depression with an associated 20% psychiatric permanent partial disability of the body as a whole and a pain disorder with an associated 20% psychiatric permanent partial disability of the body as a whole;
3. Prevailingly causally related to the two aforementioned work injuries, Mr. Archer may benefit from psychiatric treatment rendered by a psychiatrist, to consist of psychotherapy and pharmacotherapy on a monthly basis for a minimum of two years.  More likely than not, he will need open-ended treatment with psychotropic medications for the remainder of his life, 50% related to the two aforementioned work injuries and 50% related to pre-existing psychiatric problems.  However, the first two years of recommended psychiatric treatment will be solely causally related to the two work injuries;

14

>   4. Mr. Archer has the following pre-existing psychiatric disorders/disabilities:
>       a. Attention deficit hyperactivity disorder with an associated 5% psychiatric permanent partial disability of the body as a whole,
>       b. Minor depressive disorder with an associated 5% psychiatric permanent partial disability of the body as a whole,
>       c. Partner-relational problem with an associated 5% psychiatric permanent partial disability of the body as a whole,
>       d. Parent-child relational problem with an associated 5% psychiatric permanent partial disability of the body as a whole,
>       e. Impoverished educational skills with an associated 5% psychiatric permanent partial disability of the body as a whole,
>       f. Personality disorder with an associated 5% psychiatric permanent partial disability of the body as a whole.

(Tr. at 367-378).

Dr. Stillings's opinion does not include any limitations on any of plaintiff's mental abilities. Therefore, the ALJ properly disregarded it.

Dr. Stillings's finding that plaintiff is disabled due to ADHD is irrelevant since plaintiff has had ADHD since he was a child and was able to work and earn a good living for many years despite that condition and while receiving no treatment for that condition.

His finding that plaintiff is disabled due to a partner-relational problem is based on plaintiff's statement that he was married for two years and that marriage ended due to his wife's substance abuse[4] and "He does not have a girlfriend, feels that he has been emotionally damaged over the years because of his relationships with several women, and is no longer interested in having a relationship with a woman, at least at this time." There is no explanation as to how this would be related to plaintiff's ability to engage in substantial gainful activity.

His finding that plaintiff is disabled due to a parent-child relational problem is based on plaintiff's relationship with a 26-year-old daughter who has a history of substance abuse and

---

[4]Because plaintiff said he had two sons, ages 19 ad 18, during this two-year marriage, it is safe to assume the marriage ended nearly two decades ago.

15

other psychiatric problems and whose mother prevented plaintiff from having contact with the daughter since she was very young "which is emotionally distressing to him" and his discovery in the last year that he has a 13-year-old son by another woman who kept this hidden from him until she filed for and was awarded child support from plaintiff. Again, there is no explanation as to how this would be related to plaintiff's ability to engage in substantial gainful activity.

His finding that plaintiff is disabled due to impoverished educational skills is based on plaintiff's statement that he "performed very poorly academically and feels that he was pushed along nonetheless and graduated from high school." Dr. Stillings did not review any of plaintiff's academic records, nor did he explain how plaintiff was able to work as a foreman for approximately 20 years despite being partially disabled due to his high school performance.

Dr. Stillings's opinion that plaintiff is permanently partially disabled due to psychiatric problems is also based on "minor depressive disorder" and an unidentified "personality disorder." This is inconsistent with plaintiff's own report that his condition does not affect his ability to remember, concentrate, understand, complete tasks, or follow instructions; that he can pay attention for a "long time," he can follow written and spoken instructions "very well," he handles stress and changes in routine "very well," and he has "no problem" getting along with authority figures. Dr. Stillings's opinion is likewise contradicted by the report of Mary Pemberton who stated that plaintiff's conditions do not affect his ability to understand, follow instructions, complete tasks, remember, concentrate or get along with others; that he can pay attention for a long time, he follows written and spoken instructions very well, he "is a very happy man" and gets along with everyone, he handles stress "in a very calm manner," and he handles changes in routine very well. Both plaintiff and Ms. Pemberton provided this

16

information after plaintiff's work accidents but before plaintiff's evaluation by Dr. Stillings (who found that plaintiff's condition was caused by the work accidents).

Dr. Stillings's findings do not include any functional limitations, he is not a treating psychiatrist, and his evaluation (which is based in large part on plaintiff's statements) was performed for the sole purpose of assisting plaintiff in his worker's compensation case. Because the opinion does not include any functional restrictions or any discussion about plaintiff limitations with regard to his ability to perform work related activities, the ALJ properly discounted this opinion.

## VII. *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Plaintiff argues that the ALJ erred in determining that he could perform light work because light work requires the ability to stand or walk for six hours per day and the evidence establishes that plaintiff cannot stand or walk for six hours per day.

This argument is without merit. The ALJ specifically found that plaintiff could stand or walk for a total of four hours per day and would need a sit-stand option that would not interfere with his ability to perform his job.

It is the ALJ's duty to determine a claimant's residual functional capacity which is the most the claimant is capable of doing despite the combined effects of both severe and non-severe medically determinable impairments. 20 C.F.R. § 404.1545(a); Casey v. Astrue, 503 F.3d 687, 691 n.3 (8th Cir. 2007). In making this determination, the ALJ must consider "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). Here, the ALJ discussed plaintiff's testimony, his diagnostic imaging results, evaluations by six different doctors, and the lack of treatment ("Aside from two pages of treatment notes by Christine Moore, DO, dated April 26 2012, and Worker's Compensation Claim Independent Evaluations, there has been virtually no medical treatment since Dr. Lowry Jones released the claimant to

17

work on September 20, 2010.") I have reviewed the medical evidence and the ALJ's evaluation of all of the evidence of record and find that the residual functional capacity assessment is supported by the evidence.

## VIII. *PLAINTIFF'S MENTAL IMPAIRMENT*

Plaintiff argues that the ALJ erred in finding that plaintiff's mental impairment is not severe. A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a) and §§ 416.920(c), 416.921(a). Basic work activities encompass the abilities and aptitudes necessary to perform most jobs. Included are physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; understanding, performing, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work situation. 20 C.F.R. §§ 404.1521(b) and 416.921(b).

In evaluating plaintiff's severe medical impairments at step two of the sequential evaluation process, the ALJ specifically considered plaintiff's alleged mental impairments, noting that although plaintiff received treatment for mental impairments, his treatment was essentially routine and conservative. The ALJ also pointed out that plaintiff's mental condition was being treated by a general practitioner as opposed to a mental health professional. Treatment records from Dr. Gustafson show that he prescribed Klonopin; however, he did not set forth any mental limitations nor did he note any mental symptoms. His records show that on one occasion plaintiff complained of anxiety. Dr. Gustafson saw plaintiff eight times from December 5, 2008, through May 25, 2010, for a sinus infection, bronchitis, the flu, problems

18

with suspected sleep apnea, medication refills, and follow up on lab work. On February 18, 2010, plaintiff complained of anxiety and was prescribed Klonopin. Thereafter, he did not complain that the medication was not working, and no further treatment for mental symptoms was provided. In fact, four months after he was first prescribed Klonopin, plaintiff completed a Function Report wherein he stated that his condition does not affect his ability to remember, concentrate, understand, complete tasks, or follow instructions. He said he can pay attention for a "long time," he can follow written and spoken instructions "very well," he handles stress and changes in routine "very well," and he has "no problem" getting along with authority figures.

The following month, on July 21, 2010, Keith Allen, Ph.D., reviewed plaintiff's medical records and found that his mental symptoms caused no limitation in his ability to perform basic work activities (Tr. at 281-291). In support of this finding, Dr. Allen noted that plaintiff had no problems with understanding, coherency, concentrating, or answering during a face-to-face interview in connection with his application for benefits; he did not report any limitations in activities of daily living due to mental symptoms; and his primary care physician prescribed Klonopin based solely on plaintiff's complaint of anxiety and without performing a mental status examination. (Although plaintiff argues that Dr. Stillings, whose opinion is discussed in Section VI. above, had the benefit of an additional year's worth of medical records when compared to the records reviewed by Dr. Allen, I note that there were no additional medical records describing any mental symptoms during that year between Dr. Allen's opinion and Dr. Stillings's opinion.)

Plaintiff testified at his June 18, 2012, administrative hearing that he had not received treatment from a mental health professional in over five years and that he had no other mental health treatment other than medication. He also testified that while he had problems

19

Case 4:13-cv-00587-REL   Document 28   Filed 12/30/14   Page 19 of 20

remembering the dates of bills and had to write them down, he did not have any other problems with his ability to concentrate or remember. Plaintiff further testified that he did not know whether his pain had any impact on his mood, and his pain had been treated with a non-steroidal anti-inflammatory until just prior to the administrative hearing. Finally, he testified that his symptoms had stayed the same over the past three years.

The absence of any evidence of ongoing counseling or psychiatric treatment or of deterioration or change in a claimant's mental capabilities disfavors a finding of disability. Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (citing Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990)). Based on the above, I find that the ALJ properly evaluated plaintiff's mental impairment. Although the ALJ found that plaintiff's mental impairment is not severe, his assessed residual functional capacity took into consideration plaintiff's pain and the resulting loss of concentration. The ALJ limited plaintiff to simple, semiskilled work at an SVP of 4 or less, and the jobs testified to by the vocational expert were all an SVP of 2. By contrast, plaintiff's past relevant work was an SVP of 8.

## IX. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
December 30, 2014